Transportation. And we'll hear from Mr. Cullen. Good morning. Good morning. May it please the court, my name is Paul D. Cullen, Jr. and I represent the Owner-Operator Independent Drivers Association. It's a trade association of 150,000 small business truckers. They own and operate their own truck and either have their own authority to operate in interstate commerce or are independent contractors. I'd like to cover today, address first the court's recent question about jurisdiction of this matter and then go into the two independent bases with which the court may overturn the agency's order at issue here, which is to grant operating authority for two Mexico domiciled carriers to operate throughout the United States beyond the border areas. The jurisdiction over this matter arises under the Hobbs Act, 28 U.S.C. 2342, to allowing the court to enjoin, set aside, or suspend and to determine the validity, in this case, of the decision of an order of the Department of Transportation. The court, in its recent request for an additional letter brief, asked about the question of the petitioner's petition for reconsideration at the agency level of its denial of our protest of that authority. They refused to even consider it. It wasn't really ruled on. They didn't consider it at all. That's correct. And our petition for reconsideration was to demonstrate the record that we had made in fulfillment of its requirements. Both the government and the petitioner's letters described that the petition for reconsideration was timely filed. We get to whether it was allowed through different ways. The government says that it has inherent authority to accept a petition for reconsideration. Petitioners point to three regulations which we believe allow for the petitioners to ask for reconsideration. The regulation of 49 CFR 365.301, this is an application proceeding, an application by a Mexico domiciled motor carrier for authority. All application proceedings are governed by the FMCSA's rules of practice at Part 386 of this chapter. And Part 386.64 provides for reconsideration. And we also suggest that Part 386.34 allow for motions not otherwise covered by these rules. And was permitted. But so you dispute the agency's original position in its letter that motions for reconsideration are not provided for? Yes, we do. And the agency perhaps concedes that in its letter to the court saying that the petition for reconsideration was timely filed, the agency has inherent authority to entertain that petition, and also that the toll for filing under 28 U.S.C. 2344, the 60 days, it was told when we filed our petition. Assuming arguendo that a motion for reconsideration is not provided for, do you cite rules to cases in which there was an unprovided for motion for reconsideration? I do not have a case. In fact, there's not such a case, is there? I do not cite to such a case. I cite to this the regulations which provide for reconsideration of in the rules of practice in 49 CFR Part 386. I refer back to 49 CFR 365.301. All application proceedings are governed by FMCSA's rules of practice at Part 386 of this chapter. And Part 386, Section 3D6.64, provides for reconsideration within 20 days. And we filed our motion for reconsideration within the 20 days following those exact proceedings. Well, if that order — if the March order was final, but if it wasn't the final order, you should have appealed from the December order. So why do you contend that the March order that was a refusal to even reconsider the December order? Why — what's your authority that that was a final order that was appealable? When the agency entertains a petition for reconsideration, the time for filing with the — with the court is told. But they didn't — they didn't entertain it. They didn't consider it. You filed it, but they didn't consider it. They entered an order denying the petition for review. No, they — they sent a — didn't they send something that said that they, in fact, were not ruling on the petition for review? I mean, that they were not going to rule on the motion for reconsideration because they don't allow them. That is what they said in their letter, but they have apparently changed their position in their brief before the Court. Do you have an order saying it was denied? It's not considered. The last — it is so — the last sentence of that letter describes that it is so ordered that it is denied. You're talking about the May 23rd letter? Let me — let me — March 23rd, sorry. March 23rd. Maybe you're talking about something else. I am talking about that letter, Your Honor. I don't see anything that says it is so denied. It says, accordingly, the agency will not consider the motion for reconsideration sub — submitted on O — OIDA's behalf. Our argument is that they did so improperly. We have, under their rules, clear right under 386.64 to ask for reconsideration. They do not cite to any legal basis for denying us the right to ask for reconsideration under the rules. You're just saying there's an inherent right. You don't have a rule either. No. The rule is both 365.301 of Title 49 CFR says all application proceedings. What we have before us is an application to operate in interstate commerce. All application proceedings are governed by FMCSA's rules of practice at Part 386 of this chapter. Part 386 provides — .64 provides for reconsideration. But 386.64 has not been applied to protest. The — Part 386.64 is not — the language of it is not restricted to any particular type of — of order by the agency. In fact, 365.301 specifically says that 386.64 applies to application proceedings, which includes a right to protest. Why wouldn't this be — to construe it this way, wouldn't this give you a longer time than the actual motor carrier applicant to appeal? You'd have 20 days and they'd only have 10? So that's — it doesn't apply to protest. There is no — I understand the Court's inference there. But there — but the 365.301 says all application proceedings. We read that to mean including protests. Has anyone ever read it to mean that in any case law or the agency ever read it that way? It is a — it is a seldom used proceeding. There is precious little case law on this matter. The normal course of business is that the agency accepts the application and the filing fee for U.S. carriers, and very few — you know, it's very rare. There aren't very many protests since the ICC went away. That's correct. But both before and after the ICC. But let me point out here, the substance of your motion for reconsideration was to clarify or to redress the agency's obvious error in stating that you hadn't served your petition properly and you hadn't verified it. They were just wrong, and they had to admit it, right? Correct. So they may have refused to reconsider, but they also had to admit that it wasn't flawed on a procedural basis, which — which is something you would have had to overcome if you had filed a petition for review immediately. When a petition for reconsideration is filed with the agency — That was a friendly question, you know. Yes, Your Honor. Okay. I agree with Your Honor's observations of their lack of attention to our application. When a petition for reconsideration is filed, then the 60-day period for appealing the original order is told, and it is the original order denying the protest that is  Let me — let's move on to the merits, since we're eating up all your time. What is your strongest argument to say that the — you have to show that the denial of — or the grant of this petition was arbitrary and capricious, don't you? And not in accordance with law. Not in accordance with law. And what are your strongest arguments on that point? There are two main ways in which they did not comply with the law. The first is their failure to comply with the pilot program requirement of Congress and the 2007 Act, commonly referred to in the briefs as Section 6901, requiring that the agency perform a pilot program under 49 U.S.C. 31315. And that requirement for a pilot program requires that they test the safety of Mexican motor carriers. It asks them to look — to gather a reasonable sample of data and make statistically valid findings. And the inspector general and the DOT FMCSA's own Motor Carrier Safety Advisory Committee pointed out, as we catalog in our brief, that the data — there was an insufficient number of participants to the program. The data collected was unrepresentative of the universe of carriers who will be invited to apply for authority. There was insufficient data, and the data was lacking and unreliable. Those were the findings of the IG and the Motor Carrier Safety Advisory Committee. Well, I thought the IG ended up approving the pilot program. I would say that they found that the agency otherwise complied with the requirements of oversight of the carriers who did participate. But that is a different finding from the fact that there was insufficient data to make assumptions about and predictions about the safety of the universe of Mexican-domiciled motor carriers. Well, let me ask about the consequences of the pilot program as it stands. Does that mean that Jose Gomez Trucking, domiciled in Monterrey, could simply apply for a license to drive within the United States and then what would happen by virtue of the pilot program? In other words, Jose Gomez did not participate in the pilot program. And, you know, what's the implication of the pilot program for such a nonparticipant? That's exactly the fact pattern here of the two motor carriers who applied post the pilot program. And the pilot program, according to the 2007 Act, was a precondition to granting authority and demonstrating that the universe of Mexican-domiciled motor carriers could operate safely. Now, the purpose of a pilot program is to test alternative forms of compliance with the safety rules. Well, I understand that. But, I mean, do these people have to fulfill exactly the same safety standards as the American truckers? They do not. What we object strongly to is that they were not held to the same standard. Number one among them is my second issue, the second legal basis, and that is FMCSA is accepting noncompliance with our CDL statute. Our statutes require truck drivers on our highways to have a CDL issued by a state in compliance with standards set by the agency. And they are accepting noncompliance with that statute. And the agency cites to no authority to grant an exemption to that statute. Okay. Well, we have your basic points, so you have time for rebuttal. Thank you, Governor. Thank you. Ms. Keersvang. May it please the Court, I'm Dana Keersvang for the United States. The pilot program was a procedural requirement that culminated in a report to Congress. Following the pilot program, the Mexico domiciled trucks will continue to operate under largely the same regulatory regime that they operated under during the pilot program, which actually goes far beyond what U.S. and Canadian carriers are required to do. There continues to be a very extensive preauthorization safety audit, which goes significantly beyond what U.S. and Canadian carriers need to do. We inspect every truck. We inspect the company's safety protocols. We inspect their records to make sure the protocols are actually being followed. We look at the driver's licenses, the driver's records. We check the driver's English proficiency. We run them through Department of Homeland Security databases. We check the drug testing facility. We accept public comments in case the public knows something about the carrier that we do not. We verify their insurance, and we verify that their trucks have modern safety features. And that is just to get started. Then after 18 months, these carriers go through a full compliance review. And, again, unlike U.S. and Canadian carriers, they have to be at the highest level in that compliance review. Are you talking about the pilot program requirements or the requirements following the pilot program? The pilot program tested the requirements that exist, that continue to exist under the agency's regulations and are applied to all carriers going forward. That's what makes this different from the kind of pilot program in the regulation that they cite in their brief that requires a ‑‑ that talks about pilot programs where there is temporary regulatory relief. This is not such a pilot program. So that regulation is about the sample size, where there's temporary regulatory relief. We require a certain sample size because we need to be able to extrapolate, if we get rid of a regulation, what will happen. Here we were testing the very same regulations that are going to apply to Mexico-domiciled motor carriers going forward. And what the inspector general found is that we confirmed that the participants operated safely and that the agency has the monitoring and enforcement in place through this extensive regulatory regime to make sure that the companies that they actually authorize are safe and to the enforcement to make sure that anybody who is unsafe loses their operating authority. I thought the IG had significant concern with the sample size and the representativeness of the participating carriers. So the inspector general said that the sample size was not ‑‑ or at least raised concerns about whether the sample size was sufficient to draw conclusions about the universe of motor carriers. Of course, as the agency said, we didn't expect participation following the pilot program to be very large. It remains extremely small. But what the IG also found is that the agency has the monitoring and enforcement in place to make sure that the trucks actually operating in the United States are doing so safely. How do you achieve that? I mean, you're using the pilot program, it seems to me, as the gateway for Jose Gomez in Monterrey to come up to the border and say now I'm taking whatever it is up to Ohio tomorrow. And what do you do at that point? Files an application, I suppose. If that company has not been through the extensive preauthorization safety audit process that I just described where we look at every truck and every driver and all of the protocols. How can you do that? They're in Mexico and you're in the U.S. We do that. And the IG said that we were doing it successfully. Where do you do that? You're talking about the company, not the individual drivers, right? So we look at both the company and we make sure the individual drivers pass an English proficiency exam are properly licensed and go through DHS database. That's just a matter of looking at paperwork, right? So where possible, per the statute, we actually send people into Mexico to make sure that the company is doing everything that it is supposed to do. But as the D.C. Circuit held, this sample size requirement is a sample size requirement for the pilot program plan. That comes right from the text of the statute. The Secretary shall include the following elements in the pilot program plan. And it makes sense that Congress set it up this way in this situation where there were these large retaliatory tariffs pending, these $2.4 billion in tariffs under NAFTA that were really hurting U.S. businesses. Congress said, let's do this pilot program. Let's make sure that we have the monitoring enforcement in place, that the people actually operating here are operating safely, and then we can go forward, get rid of the tariffs. They have a report so they can decide if they want to do something different. This is an area in which Congress has been very active. And then, you know, let's let the pilot program go forward and get rid of these tariffs. Congress allowed the pilot program to go forward after Mexico imposed the tariffs. And, in fact, 29 members of Congress wrote a letter to the agency saying, please move forward with this because it's cost tens of thousands of jobs and billions of dollars in lost revenue. For whom? Well, the administrative record that's at Fed Reg 404, 24 through 25, it cites a lot of letters from people, from U.S. businesses, who felt that they were hurt by these tariffs and were asking the agency to move forward. They were hurt by what? I don't understand. Mexico imposed tariffs on what, American goods or American trucking companies? On American goods that go across industries, agriculture, manufacturing. And why? Because their trucks were not allowed to operate freely in the U.S.? Exactly. I thought that was a NAFTA matter that had to be ruled on by NAFTA arbitral panels. So this was ruled on by a NAFTA arbitration panel back in 2001. Mexico suspended the sanctions while we were moving forward. Then Congress removed funding for the pilot program in, I believe it was 2009, ended the prior pilot program, and then Mexico imposed the sanctions, which they again suspended when we began the second pilot program. Well, I realize all that's in your brief, but it's hard to assimilate. What is the appellate jurisdiction here? Couldn't the OOIDA have filed a suit in district court challenging the final results of the pilot program? No. Jurisdiction under the Hobbs Act is direct in the Court of Appeals, but they did file a suit in the D.C. Circuit challenging the pilot program plan. Well, I understand that, but it seems to me challenging a plan at its inception is clearly a different thing from when it's completed. So I think they would have had the ability to do that. But what's the appellate jurisdiction here? Sure. The appellate jurisdiction comes from the Hobbs Act, and we do think that there is jurisdiction to see if the agency had authority to do what it actually did here, if it had authority to grant operating authority to a particular carrier. We think that question is easily settled on the merits. This pilot program requirement was a procedural requirement. It culminated in a report to Congress. We can read that out. But, I mean, Mr. Cullen was peppered with questions about appellate jurisdiction, and you're just giving us an ipsy-dixit. So what's your ipsy? Sure. So looking at the question that the Court asked for supplemental briefing on, we do, motions for reconsideration do generally toll time. The agency had the authority to consider this. We hadn't said we wouldn't do it. And we think generally it is in everybody's interest for people to bring these concerns to the agency first before they take them to the court of appeals. Do you have authority when motions for reconsideration toll time when there's not a provision for motions for reconsideration? I don't have a published site for that, Your Honor. But the D.C. Circuit does it routinely. We, in our brief, cited a case involving the Postal Regulatory Commission, which similarly does not have regulations governing motions for reconsideration. Of course, we don't think that the regulation applies to the decision on the protest, but because we do have inherent authority to grant the motion and we do think that that kind of argument should be made to the agency first, we don't. What is your interest in our taking jurisdiction over this appeal, given if there's a serious question about it? Your Honor, as a general matter, we think that the agency has the authority to consider this and that, therefore, and they hadn't said they wouldn't do it, so, therefore, we think there's jurisdiction. Of course, there would be some benefit to the government if you decided to send jurisdiction. We just don't think that's the best answer. Are you concerned with the denial of the protest? Are you concerned with the authority to even grant these kind of Mexican carriers permission to come in in the first place? What are you after here? Well, we think that this whole process holds up. We understand their challenge to be not to the particular carrier. I don't think there have been any safety concerns raised about these particular carriers. We understand their challenge. For approving them. Right. Exactly. So we understand their challenge to go to the agency's authority to authorize these carriers. Of course, in a similar case of the Ninth Circuit, the part by the Teamsters, they challenged the actual grant of the actual grant of operating authority. We do think that's a better way to do it, but these are obviously very closely related decisions, and we see them really all in this case. The protest decision is the final step in the road of deciding whether or not to approve California's unitis in this particular case. What is the status of the pending Ninth Circuit case? The Ninth Circuit heard argument in March, so that case is pending. I just find this, excuse me. Putting a five here in your brief, I just find very difficult to interpret. It's page 21, and it's a long, long paragraph that says the agency can grant a protest only on the ground that the registrant fails or will fail to comply with the applicable regulations, blah, blah, blah. Thus, the decision on a protest must be based on these statutory factors applied to an individual carrier, not on the agency's action adopting a broad program such as the Mexican truck program. Accordingly, there is no basis for the agency repeatedly to consider petitioners' broader arguments. So how can you ask us to rule on the merits if the statute says we're going to, if FMCSA could only rule on the statutory criteria? Well, generally, there's a high bar for removing jurisdiction for the court to say that the agency is acting ultra vires. If the agency really did not have authority to authorize these particular carriers, we do think that this Court could review that on a petition for review of a grant of operating authority. Of course, we think that that question is pretty straightforward. Now, in this case, of course, they didn't petition for review of the grant of operating authority, and that puts us in an unusual position. We did view these as sufficiently closely related. We understood that they were challenging the merits in this Court. We thought that under the unusual circumstances of this case, that that decision on the protest was the final step in the road of deciding whether or not to authorize this particular carrier. So the Court has everything it needs before it to decide this matter. But we also understand that you could view these as not sufficiently related, that a challenge to the protest or the pilot program. Right. I'm not sure I understood the question. I interrupted you. Excuse me. You said you could separate. We understand that the Court could view them as not sufficiently related, that you can reach both. And in that case, then, we do think that the proper thing to do would be what the Teamsters did in the Ninth Circuit and challenge the actual grant of operating authority. Certainly, the protest itself is, before the agency, is limited in safety of the particular carrier, and there are no concerns about the safety of the particular carrier in this case. If this were characterized as just a challenge to the sufficiency of the pilot program, then it would just have the same basis for review as this International Brotherhood of Teamsters, right, the recent D.C. Circuit case? So the D.C. Circuit case was a challenge to the design of the pilot program, which was done. I understand. I just understood. That was done through notice and comment, and then the petition for review of that final setup that was published in the Federal Register, they petitioned for review of that. And that's the way pilot programs typically work. The review is on the front end of how the pilot program is designed. If the agency needs to make changes, any change to the regulations can then be reviewed when the regulation is changed. But, of course, here we were testing the actual regulatory regime that has been in place since 2003 and will continue to apply to these Mexico domiciled motor carriers operating nationwide. So here, you know, the D.C. Circuit conducted its search and review on the front end, and since the regulations are already in place, existing law already required the agency to grant operating authority to these carriers if they met the safety requirements. Once the pilot program was complete, we think that's everything that was required. And, of course, we do think that makes a lot of sense here, where there are these retaliatory tariffs pending under NAFTA, and Congress has been very active. Congress has the information. We reported to Congress about the sample size. They have the IG's report about sample size.  step in and do that. But under the current regulations and statute, once we completed the pilot program, we were required, and we did, go forward and grant operating authority to the carriers that satisfied this extensive regulatory regime and pre-authorization safety requirements. Well, I gather, though, they made their application, and it was granted just a few months later, right? When did these carriers file their applications? I do not recall. Well, I don't want to – I do think it was relatively within a matter of months, not years. Yeah, because then they filed – it seemed to me it all took place within 2015, maybe, because March of – you approved the permits in December of 2015, but I think that's correct, Your Honor. Of course, the IG looked at our pre-authorization safety audit process. They looked at what the agency was doing, and they did not identify concerns. There were a few concerns at the outset that the agency remedied, but by the end of the pilot program, the IG said that there were no concerns about the agency doing what it was supposed to do, that the agency had the monitoring and that the trucks that are actually here operating were operating safely. So you think that authority is not something that's before the court brought along with the protest? I'm sorry? Are you saying that the agency's authority to even issue these kind of permanent operations to Mexican vehicles, that's not something that we're supposed to determine? Because it seems like that's being argued also, in addition to the denial of the protest. So we do think that under the very unusual circumstances in this case, where the final action was the denial of the protest, that you can look at whether the agency had the authority to do what it did in this case. Authority to deny it or the authority to even grant the completion of the pilot program and to authorize these trucks to – these Mexican trucks to come here. Is that issue before the court also? Whether the agency has the authority to authorize U.S. domicile – sorry, Mexican domiciled motor carriers, we do think is before this court. We do think that's a fairly straightforward question. It's only limited to whether the agency satisfied the statutory requirements. I see that I'm getting close to the end of my time. If there are any questions on the driver's license issue, I'd be happy to address those. Of course, we do think that there are very good reasons that for the last 20 years nobody has understood this statute as overriding the regulation for all of the reasons that the D.C. Circuit held. I was going to say, that's resolved by the D.C. Circuit, isn't it? That's right, Your Honor. That's the – yeah. If there are no further questions, I ask the Court to deny the motion for review. Okay. Mr. Cullen. Thank you. With regard to the focus of this challenge as to the agency's grant of authority, the agency is authorized to grant authority to motor carriers under 49 U.S.C. 13902. And that section says that the agency grants authority if a motor carrier is willing and able to comply with all of our rules and regulations. And yet in this pilot program and in their policy that they've decided upon after the pilot program, they are accepting noncompliance with the CDL statutes. To operate on our roads, you must have a CDL under the statute. And they say to no authority under 13902 or anywhere. Well, aren't you really just challenging the D.C. Circuit decision? No. The D.C. Circuit – I thought they ruled that the CDL was not a meritless – I mean, it was a meritless complaint. The D.C. Circuit's decision was constrained to the pilot program. It said for the pilot program. It was interpreting the pilot program mandate in Section 6901 and said in this context for the pilot program, Mexican drivers may use their Mexican commercial driver's license. And the rationale, I believe – we believe that's a very generous reading of the statute when the statute 6901 simply requires the agency to describe the U.S. rules for which it will accept compliance with Mexican rules in lieu of. And that's a notification requirement. We do not read 6901. We disagree, at least to the extent of the pilot program, with the D.C. Circuit's opinion that this appropriations bill granted an exemption to a statute here. Well, precisely what they say is the drivers' associations have us find that these two laws are worthless surpluses. Reading all of the statutes together as we must, we think the more sensible conclusion is that Congress decided that Mexico-domiciled truckers with Mexican commercial driver's licenses could drive on U.S. roads. We did not think they're surpluses. We thought that they are notice requirements as part of the pilot program, that the agency is required to give notice if they're granted exemptions. And we're reading the part of the D.C. Circuit's opinion that says, we therefore conclude that the pilot program allows Mexican truck drivers to use their Mexican-issued commercial driver's license. But that's because the law as a whole allows them to. I mean, that's my reading of it. Anyway. It is. It's a hill to climb. We find no — these are notice requirements. These are publish what you have. It's not a grant of new authority to exempt carriers from other statutes there. The language from the D.C. Circuit allows them to operate with their Mexican licenses just for the pilot program? Correct. And then after they pass, whichever carrier companies pass, then they have to have United States-approved driver's licenses? Yes. Certified. Or under the pilot program scheme under 31315, Title 49 USC, I will — that's one point that opposing counsel made. She said it was not this type of pilot program that we cited to in the statute, and yet Section 6901 does cite to the pilot program statute that the agency must follow. And how a pilot program operates is to test an alternate form of compliance, and then the report required under that statute makes recommendations to Congress as to whether or not the statute should be amended, because they have successfully tested whether or not some other form of compliance would provide the same level of safety. And that's why — that's what would be appropriate, to ask Congress to grant that authority that doesn't already exist to operate without a USC ADL.  And under NAFTA, we made no provision, no promise to grant exemptions to any of our laws. NAFTA allows us to maintain and enforce all of our safety laws. We made no promise to give them exemptions to the CDL statute, for example. Okay. We have your argument. Thank you. Thank you very much.